[Crim. No. 2897. Second Appellate District, Division One.—January 12, 1937.]

THE PEOPLE, Respondent, v. BAYARD E. WEIBERT, Appellant.

458

Mark F. Jones, John L. Harris, C. M. Mooslin and W. L. Engelhardt for Appellant.

U. S. Webb, Attorney-General, R. S. McLaughlin, Deputy Attorney-General, Buron Fitts, District Attorney, and D. L. DiVecchio, Deputy District Attorney, for Respondent.

DESMOND, J., *pro tem.*—Defendant was convicted in a jury trial upon seventeen counts presented in two consolidated cases, and has appealed from each judgment of conviction. The appeal was grounded upon various specifications, but by his brief appellant has abandoned all grounds except the insufficiency of the evidence to sustain the judgments. In order to determine the validity of the objection, as directed to each of the judgments, and because the defendant has been sentenced to state prison on all counts, nine of the terms to run consecutively, it has been necessary for us to read the entire transcript, and to examine all exhibits introduced in evidence. This we have done with great care, and find that the objection is not well taken, except as to the convictions on counts VI and XIII of information No. 63628, charging grand theft committed against Louis R. Langworthy and Ethel Pepin, respectively.

The record shows that the defendant became interested, a few years ago, in radio transcriptions, and during the year 1935 secured a sum of money, aggregating approximately $40,000 to $50,000 from various individuals, many of whom also were interested in radio programs. During August of that year, he met one Forrest Johnston, then residing in Oakland, who had had considerable experience as a radio advertising and publicity man. Defendant arranged to have Johnston and an attorney, named Waddell, come to Los Angeles at his expense. While in Los Angeles, Waddell

dictated articles of incorporation for International Transigram, Ltd., and on August 26, 1935, the Secretary of State of Nevada issued a certificate showing that the articles were on file in that state and that they contained all the statements of facts required by law. On August 21, 1935, an agreement had been entered into between Johnston and Waddell, as parties of the first part, and defendant, as party of the second part, whereby the first parties undertook to organize the corporation to be ''called International Transigram, Ltd., of 80,000 shares, capital stock without nominal or par value, in the state of Nevada for the purpose of carrying on the business of forming, developing, and maintaining a broadcasting service for and with broadcast stations of the United States and other countries, which service shall, in effect, constitute a broadcasting chain or system of radio stations designed to render sales service, both for broadcast stations and for advertisers and/or advertising agencies in the general field of merchandising, production, and station release service''. They also undertook to attempt to secure the necessary sanctions, lease rights, contracts and other permits and agreements, together with permission required for such activities by all national, state, municipal and other authorities, groups, organizations and individuals. This contract contemplated the use by the first parties of the studios or studio of the second party for execution of its mechanical production activities, and bound the first parties to employ the recording facilities of the second party exclusively whenever possible. The agreements, licenses and sanctions were to be secured for and in the name of the Nevada corporation, and the second party agreed to advance (in various amounts from time to time, as required) the sum of $10,000 to meet the financial requirements of the project for which, by the terms of the agreement, he was to receive 40,800 shares of the capital stock of the corporation.

After the papers incidental to this incorporation were prepared at Los Angeles, Johnston and Waddell returned to Oakland, but a few days later went to Washington, D. C., where during a period of three or four months they engaged in the business of promoting the objects of their enterprise by establishing contacts with various individuals and commissions, and arranging for contracts with independent radio stations. There was evidence adduced at the trial to indicate

that they were successful in obtaining contracts with fifty-two stations, and it is quite conceivable that, if the operations of the defendant had not been abruptly terminated by his arrest, additional independent stations would have entered the network by means of contracts negotiated by Johnston and Waddell. During the period of operations above described, or shortly before or thereafter, the defendant entered into negotiations with, and obtained cash and property from, various persons, and these transactions form the basis of the counts upon which he was convicted.

It was charged in the information that on November 1, 1935, he obtained stock worth $3,282.73 from George S. Rodd; that from Charles H. Parker he obtained $2,000 on November 20, 1935, $500 on December 5, 1935, and $3,000 on December 12, 1935, all three transactions being set up in separate counts of the information. It was charged in another count that on November 23, 1935, he obtained $2,000 cash from Louis R. Langworthy; that on January 23, 1936, he obtained stock worth $3,342.23 from Dorothy Webb; that on November 27, 1935, he obtained $15,000 from Dana Clark, and on October 22, 1935, a trust deed and $1,000 cash, a total of $6,610, from Ethel Pepin. ■ It was also charged in one count that on July 23, 1935, he obtained stock worth $7,654.45 from Mrs. Sloan-Orcutt. As to this count, it may be said that the evidence showed that defendant paid $6,073 to redeem this stock from a pledge, later selling it for $7,654.45, and since the difference between the two figures exceeds $200, the transaction furnished a sufficient basis for a charge of grand theft.

Taking up the above transactions in order, we find introduced in evidence a letter dated November 1, 1935, addressed to Rodd and signed by defendant, setting forth the agreement of the parties whereby the defendant received from Rodd shares of stock in Owens Illinois Glass Company and United States Steel Corporation ''with the approximate market value of thirty-three hundred dollars, which stocks the undersigned agrees to accept as a loan of two thousand dollars ($2,000), the balance of $500.00 to be paid to the undersigned (that is, to the defendant) by you in cash''. As to this transaction, Rodd testified that he paid $500 in cash, and as to the securities which were the property of Mr. Rodd's aunt, ''I told him that they must be treated absolutely as a trust fund, and under no circumstances sold, be-

cause my aunt was receiving dividends and the stock must not be disturbed; he assured me that these stocks should be returned to her and probably within 90 days.'' Notwithstanding that defendant, according to his own written statement, accepted the stock as a loan of $2,000 on November 1st, the record shows that on November 2, 1935, he sold it for $3,282.73.

As to the first of the three transactions with Charles H. Parker, a letter of November 20, 1935, was introduced, signed by defendant and addressed to Mr. Parker, acknowledging receipt of $2,000 and promising to deliver 400 shares of International Transigram, Ltd., within fifteen days. Mr. Parker never received the stock. The defendant assumes that the conviction as to this count could be upheld only upon the theory that the money was secured by false pretenses made by the defendant, and argues that testimony of the representations made to Mr. Parker related practically altogether to possibilities of the future; in other words, that none of the material representations constituted a misrepresentation of a past or existing fact. Defendant also claims that the corroboration of Mr. Parker's testimony as to any misrepresentations is not sufficient to meet the requirements of section 1110 of the Penal Code, therefore, not sufficient to sustain a conviction. However, if the money, $2,000 in amount, were obtained from Mr. Parker by means of a trick or device practiced upon him, the conviction of grand theft is valid upon that theory. As we have noted, the defendant promised under date of November 20th to deliver 400 shares of International Transigram, Ltd., within 15 days thereafter. On January 31, 1936, Parker wrote the defendant formally requesting delivery of the 400 shares of stock, but he never received the same. The money obtained from Mr. Parker was to be used for corporation purposes. As a matter of fact, no portion of the funds ever passed to International Transigram, Ltd. We may note at this time that no money obtained from any of the persons involved in these transactions with defendant was ever turned over to the treasury or the corporation which he or his associates organized, though it cannot be denied that a very large part of the moneys received by the defendant, while always held and expended by him personally and not by means of corporations, was spent for items directly related to the transcription business in which

he was engaged. We refer to moneys expended in establishing offices in Hollywood and later for acquiring and remodeling at large expense a studio on South Western Avenue in Los Angeles, where, over a period of months, the defendant employed and paid, from funds received from the complainants, a large number of people upon work in connection with the production of records, including publicity men, secretaries, research directors, and many others. He met the expense of maintaining his associates in Washington, also paying traveling expenses there and to other points, as well. He also put on an elaborate opening program at the studio on Western Avenue, which was attended by the Governor of the state of California, and many other prominent people. However, Mr. Parker's money was delivered to the defendant with the expectation induced by the defendant that it would go into the treasury of International Transigram, Ltd., when as a matter of fact it never reached the treasury, and was used by defendant for his own purposes which happened to be, in large part at least, the purposes for which the corporation might well have used the money, if it had ever reached its treasury. We believe that upon the facts in this instance and, excepting the Langworthy and Pepin transactions, in the other cases where the defendant assigned or agreed to deliver stock or interests in corporations or profit sharing enterprises without having secured authority to do so, convictions of grand theft may be sustained on the theory of larceny by trick and device. (*People* v. *Von Badenthal,* 8 Cal. App. (2d) 404 [48 Pac. (2d) 82]. See, also, *People* v. *White,* 124 Cal. App. 548 [12 Pac. (2d) 1078].)

The second transaction with Mr. Parker related to a check for $500 on the Seaboard National Bank delivered to Mr. Parker by defendant and returned protested for nonpayment. Parker testified that on December 5, 1935, the defendant asked him to exchange checks, drawn by each of them upon his own bank, for a short time, defendant saying that he had deposited in his account in the Seaboard National Bank of Los Angeles a $750 check drawn upon a San Jose bank which would require several days in clearing. To accommodate the defendant, Mr. Parker delivered to him his check for $500 drawn upon the Banker's Trust Company of New York City. The check upon the Seaboard National Bank, together with the notice of protest and the ledger sheet of defendant, cover-

ing the period in question and showing that at that time he was not in position to meet a check for $500, were introduced. Mr. Parker testified that no part of this $500 was ever returned to him by the defendant. ■ As to the $3,000 transaction with Mr. Parker, it appears that the defendant on December 12, 1935, acknowledged in writing the receipt of that sum of money, describing it as $3,000 which "you are lending to me for a period of ninety days, and in consideration of which I agree to the following covenants:

"To repay said loan within 90 days from date hereof.

"To evidence said loan by a collateral note for like terms, bearing interest and secured by 12,000 shares of the capital stock of International Transigram, Ltd.

"To transfer and deliver to your account 600 shares of the capital stock of said corporation, fully paid, said 600 shares of stock to be transferred from the personal holdings of the undersigned."

Mr. Parker testified that some weeks later, when neither the collateral note nor the stock had been delivered, he talked to defendant and demanded delivery of the 12,000 shares of stock which, however, he never obtained. The block of 600 shares of stock, which the defendant promised and which was to be a bonus for furnishing the $3,000 as a loan, Mr. Parker never received. It appears that conviction upon this count also can be sustained upon the ground that the offense constituted larceny by trick and device. (See *In re Clark*, 34 Cal. App. 440 [167 Pac. 1143]; also, *People* v. *Rae*, 66 Cal. 423 [6 Pac. 1, 56 Am. Rep. 102].)

■ As to the transaction with Mr. Langworthy, the defendant furnished him with a receipt reading as follows:

"November 23, 1935. Received of L. R. Langworthy, Five hundred dollar deposit on 400 shares of capital stock of International Transigram, Ltd., personally owned stock sold to you at the price of $5 per share.

"BAYARD WEIBERT."

The balance of the purchase price, $1500, Langworthy sent to the defendant from San Diego under date of November 26, 1935. It appeared upon the trial that no stock was ever delivered to him by or on behalf of the defendant, and the money received from him was used in the same way as that received from Mr. Parker and the other persons named in the various counts of the information, namely, the major

portion for financing the projects in which defendant was engaged; a smaller amount for defendant's personal use, including the payment of debts previously contracted by him.

As to the transaction with Dorothy Webb, the record indicates that by a written instrument of January 23, 1936, defendant acknowledged receipt of 60 shares of General Motors common stock, property of Miss Webb, which he agreed to use as collateral for a loan of $2,500 for a period of six months. Instead of using the stock as collateral for the loan, he sold it on the following day for $3,342.23. By this same instrument the defendant agreed to have executed within 30 days an assignment of 2½ per cent of the business "Transcontinental Broadcasting System", claiming to own more than a 50 per cent interest therein.

As to the transaction with Mrs. Sloan-Orcutt which we have heretofore mentioned, it appears, according to her agreement with the defendant, that her stock was to be held as collateral for the sum of $6,073 which defendant had advanced to take it up from the Security-First National Bank where it was pledged for a $6,000 loan. Defendant furnished this complainant with an instrument dated July 19, 1935, reading as follows:

"Received of Mrs. Leafie Sloan-Orcutt the following securities: 70-shs. Los Angeles Industries, Inc., Ctf 01381 1234-shs. Niagara Hudson Power Corp. common $15, Pf.Ctfs. No. C019867, (34 shs), No. C4048/59 (100 shs ea), which has been collateral for $6,000.00 loan against which I have advanced the sum of $7,000.00.

"12 month contract covering this transaction and arrangements for the amortization of this loan will be prepared and executed within five days from date.

"(Signed) BAYARD WEIBERT."

Mrs. Sloan-Orcutt testified that at the time of this transaction she said to defendant: "Mr. Weibert, I want you to write on there that you will give me back the original stock my father left me. . . . He wrote it then, right then and there." As a matter of fact, the document introduced in evidence shows in the handwriting of the defendant, added to the printed portion above shown, the following: "Contract will provide for return of 1,234 shares of Niagara Hudson Power Corp. common to Mrs. Sloan-Orcutt at the end of one year. (signed) Bayard Weibert." No contract was ever

delivered to this complainant, and it was stipulated that instead of the 1234 shares of Niagara Hudson Power Corporation being returned to Mrs. Sloan-Orcutt, it was sold by the defendant for $7,654.45.

As to the Dana Clark transaction, the defendant furnished this complainant with a letter dated June 27, 1935, reading as follows: "This is to acknowledge receipt of the following securities, which you have placed in my hands for the purposes as previously instructed by you, and which are to be maintained in equal value." Then follows a list of securities, which the defendant and Miss Clark both testified were left with the defendant "for liquidation" through his account with Greenwood & Company, brokers. Instead of maintaining the securities of Miss Clark "in equal value" with their worth as of the date of receipt, the defendant, who sold them for $24,194.45, apparently furnished her with no investment of any value, although he did return to her approximately $7,500. Miss Clark testified that she saw two stock certificates, one for 4,000 shares in her name, and the other for 12,000 shares in defendant's name, and that both certificates, she believed, were for stock in International Transigram, Ltd., and that "when the stock was good, . . . it would be mine". It does not appear from the record that either of these two certificates was ever actually delivered to Miss Clark, and it is apparent that her investments entrusted to the defendant were not maintained in equal value, or, so far as we can determine, in any value at all.

As to the transactions with Ethel Pepin, we note that defendant secured from this complainant a trust deed of the face value of $5,610, upon which he was to borrow $5,000. He was unable to borrow more than $4,000 on that security, and Miss Pepin then advanced him $1,000 cash, upon his agreement to indemnify her for the difference between the amount realized on the note and the face value of the trust deed obligation. He also promised, according to a written agreement dated October 3, 1935, to furnish her with a $5,000 ninety-day note secured by assignment of the lease upon the studios located at 729 South Western Avenue, together with all fixtures and equipment therein, and further to issue or cause to be issued to her 5 per cent of the authorized capital stock of a new corporation to be formed and completed within approximately 30 days. "Said corporation to be organized

for the express purpose of completing negotiations for control of station time with 200 nationally distributed radio stations, all of the preliminary organization in connection with which has been completed by our representative in the East, Mr. James E. Waddell.''

This mention of a new corporation undoubtedly is a reference to a corporation known as Transcontinental Broadcasting Company, Inc., which was organized by Waddell, while he was in Washington, under the laws of Delaware. There was introduced in evidence a letter from Waddell to defendant, dated November 1, 1935, saying: ''Our organization was finished today. We are now the Transcontinental Broadcasting Company, Inc.'' That this was the corporation defendant had in mind when he signed the letter of October 3, 1935, addressed to Ethel Pepin, is also evidenced by his statement upon the witness stand to the effect that ''She told me she would prefer having an interest in the corporation that was handled by Mr. Waddell in Washington. I agreed that her interest in that corporation would be 5% of the capitalization, when completed, for the loan of $5,000, in that the corporate structure back there was being set up as a $100,000 corporation.'' Complainant, Miss Pepin, testified that the defendant never furnished her with any assignment, chattel mortgage or any other form of obligation. She testified, as to the corporation mentioned in his letter, as follows: ''I understood at the time that Mr. Weibert wrote that first letter dated October 3, it was about to be formed, but had just been completed, and this money I was to give him was to pay for the completion of the corporate stock structure they were just forming.''

Of the total amount of money obtained from this complainant defendant repaid only the sum of $700, and, according to the record, never kept any of his promises either to deliver stock of the new corporation or to make an assignment of his studio lease or equipment. In this transaction and also in the Langworthy transaction, hereinbefore referred to, the defendant received money upon his promise to do certain things, which promises were not kept; therefore, the defendant is chargeable with breach of contract, but we are not satisfied, upon examining the record, that in either transaction he was guilty of committing any species of grand theft.

Thus far we have considered only the charges of grand theft brought against this defendant. ▉ In addition, the informations charged him with violations of the Corporate Securities Act committed in obtaining money or securities from Mr. Parker, Mr. Langworthy, Miss Webb, Miss Clark and Miss Pepin. We have made mention of defendant's agreement made in writing with each of these persons, to deliver stock or a percentage interest in the business or organization which he represented as already functioning or in contemplation. He was also charged in two additional counts with violating the same act in his dealings with a Mrs. Runnion and a Mrs. Shellhorn.

As to Mrs. Runnion the People introduced a writing signed by her and by the defendant on January 3, 1934, by the terms of which, in consideration of the delivery to the defendant of three trust deeds aggregating $11,000 in face value and $1,000 cash, he gave Mrs. Runnion his promissory notes payable over a period of two years in monthly instalments and "as an additional consideration for the aforesaid consideration passing from said Frances Runnion to said B. E. Weibert, and as collateral security for the payment of the above promissory note of $10,000.00 executed by said B. E. Weibert in favor of said Frances Runnion, said B. E. Weibert hereby assigns and sets over unto said Frances Runnion his entire interest in any and all of the net proceeds which he shall or may become entitled to receive as a member of said Allen Productions from the distribution of the aforesaid twelve two reel picture photoplays to be reproduced and distributed pursuant to the terms of said agreement of November 28th, 1933, between said Allen Productions and Jackie Coogan Productions, Inc., until said Frances Runnion shall receive therefrom and from the payments to be made by said B. E. Weibert on account of said $10,000.00 promissory note the entire amount of the principal and interest thereof; and that thereupon, and after said promissory note of $10,000.00 shall have been fully paid, said B. E. Weibert agrees to, and by these presents does assign unto said Frances Runnion, in consideration of the premises, forty per cent of his proportion of the net proceeds which said Allen Productions may or shall receive from the distribution of said picture photoplays to be produced pursuant to said agreement of

November 28, 1933, which said interest shall be and remain the absolute property of said Frances Runnion''.

Mrs. Runnion testified that both she and the defendant were interested in motion picture enterprises and ''I understood that the money that I had been putting in was to be used for general motion picture production, the Coogan picture and whatever it was needed for or the promotion of these pictures, if I got it right.'' It is nowhere questioned in the transcript that the nature of Mrs. Runnion's investment was thus correctly stated by her, and since it was stipulated that no permit was issued or asked of the corporation commissioner relative to Allen Productions and defendant admitted that at no time did he ever file an application for a permit with the corporation commissioner of California, it appears that the transaction does not fall within the saving clause numbered paragraph 3, subsection (c), clause 11, section 2 of the Corporate Securities Act (immediately preceding sec. 3 thereof), (Stats. 1931, p. 941), which exempts from operation of the act the sale of one's own personal securities under conditions therein stated. The same must be said of all other instances where defendant agreed to issue or deliver stock or other interests.

Defendant's transaction with Mrs. Shellhorn was somewhat similar to that with Mrs. Runnion, indicated by the following document introduced in evidence:

''Transigram Sound Corporation. September 28, 1935. ''Mrs. Arthur L. Shellhorn, Pasadena, California.

''Dear Madam: This will acknowledge receipt during the past year of sums of money totaling one thousand ($1,000.00) dollars, for which I agree to repay as follows:

''Upon the completion of the corporation known as the International Transigram, Ltd., I will assign or cause to be assigned to you, one (1%) percent of the capital stock of said corporation. Upon your acceptance, I shall cause to be prepared for execution my promissory note as above specified, and my agreement with you to cause to be issued to you or your order the above mentioned one percent of the authorized capitalization of said proposed company upon the completion of its incorporation.

''I specifically agree to cause said incorporation to be completed within thirty (30) days from date of our agree-

ment barring Acts of God, accidents, or other hinderances beyond my control.

"Respectfully yours,

"(Signed) BAYARD WEIBERT."

Mrs. Shellhorn testified that the money paid by her and derived from the sale of certain stock which she owned and delivered to the defendant was for preliminary work in the way of forming some corporation, which would deal in radio broadcasts and particularly education. She also testified that she never received any stock, but the Corporate Securities Act may be violated without any stock passing or even without the present existence of a profit sharing enterprise. (*People* v. *Oliver*, 102 Cal. App. 29, 36 [282 Pac. 813]; *People* v. *Shafer*, 130 Cal. App. 74, 76 [19 Pac. (2d) 861].)

We hold that as to all counts charging violation of the Corporate Securities Act, and as to all counts charging grand theft, excepting the Langworthy and Pepin counts, the evidence of guilt was sufficient.

The judgments are reversed and new trial ordered on counts VI and XIII of information No. 63628. Judgments on all other counts are affirmed.

Houser, P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 25, 1937, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 11, 1937.