[Crim. No. 4590. In Bank. Oct. 30, 1945.]

THE PEOPLE, Respondent, v. THOMAS P. SIDWELL et al., Appellants.

James E. Pawson, John N. Metcalf and Bernard Brennan for Appellants.

Robert W. Kenny, Attorney General, Frank Richards, Deputy Attorney General, Fred N. Howser, District Attorney, and Jere J. Sullivan, Deputy District Attorney, for Respondent.

SCHAUER, J.—The defendants, Sidwell and Davis, were charged with violation of the Corporate Securities Act (Stats. 1917, p. 673, as amended, Deering's Gen. Laws, Act 3814) in that, on June 1, 1940, they knowingly sold a "certificate of interest" in an oil and gas lease, "to wit, five per cent of all oil, gas and other hydro-carbon substances from a [described] well," without having obtained a permit from the Corporation Commissioner. Defendants each pleaded not guilty, waived a jury, and after trial were convicted and sentenced to imprisonment in the county jail for the term of one year. They appeal from the judgments of conviction and from an order denying their motions for new trial. Defendants contend that the transaction for which they were prosecuted was primarily a loan and not a sale of a security within the meaning of the Corporate Securities Act, and that, if the act does require the obtaining of a permit for such a transaction, it is to that extent unconstitutional. We have concluded that these contentions cannot be sustained.

On June 1, 1940, the defendants and one Moore (the complaining witness) signed, and defendants delivered to Moore, an agreement which reads as follows:

"In consideration of Five Thousand ($5000.00) Dollars advanced by you [Moore] to us [defendants] covered by our note for that amount dated June 1, 1940 running for ninety days and bearing interest at the rate of six (6%) per cent annum, we hereby agree to set aside or cause to be set aside for you 5% of all oil, gas and other hydro-carbon substances of production in the well known as Chicago Oil Co. Founders #1. . . . It is definitely understood between all of the parties to this letter [agreement] that this transaction does not constitute a sale or a purchase of the above described 5% interest in the . . . well, but that proper application will be made through proper authorization upon completion of said . . . well to have such interest duly issued and placed in your name or such nominee as you may designate under permissive authority. In any event . . . Davis and Sidwell acknowledge the advance of said $5000.00 covered by note as above described as a full personal obligation. Such interest in the well as may be permitted will come from their own interest

or interest controlled by them. . . . In any event said $5000 note shall be paid to Joseph J. Moore on the due date together with interest thereon.''

The agreement in typewritten form had been prepared by defendants; the last sentence was added in handwriting, after all the parties had signed, at the instance of Moore and on the advice of his attorney. As part of the same transaction Moore delivered $5,000 to defendants and defendants executed and delivered to Moore their promissory note described in the agreement. No application to the Corporation Commissioner for a permit to issue a certificate of interest in the described well was made by or on behalf of defendants. The well was never put on commercial production. At the time of trial the note had been partially, but not fully, repaid.

The circumstances leading up to the execution of the above-quoted agreement, according to the testimony of Moore, were as follows: Defendant Sidwell told Moore, his neighbor, that he (Sidwell) and defendant Davis were ''in the oil business, digging a well on the Rosecrans field and that I ought to go in on it. . . . That he had gone down around 7,000 feet, that some big oil company had supplied the equipment and the derrick and one thing and another, and that they knew their business, and that there was not any risk to it at all. That they also had royalties and assets from other wells and that if I would give them $5,000 to complete the well to go down a few feet they would guarantee me 5% of the oil and gas and if they did not strike any oil it wouldn't make any difference, my $5,000 would be secured. They would pay me the $5,000 back plus 6% interest.'' Sidwell ''took me down there, showed me, well, his derricks. He said, 'Do you think these people would be putting up the pipes and materials if they didn't know there was oil here?' '' Sidwell and Moore thereafter went to defendants' office, where Davis told Moore that if he advanced $5,000 he would receive ''5% of the oil and · gas that was produced from the well and they would at least get around a 500 to 1,000 barrel well.''

Defendant Sidwell testified that ''we always very definitely told Mr. Moore we had no interest for sale, but . . . if he would make us a loan we would stand behind the loan. He said, 'What security will I get for the loan? . . . I want to have a bonus.' So we said, 'The well is not on production yet, but we will set aside 5% of the oil from the well as security for your note. We will stand behind the note itself.

And then after the well is on production we would apply to the department for a permit.' "

Defendant Davis testified that "Moore asked what we could do in the nature of security for him in the event that he loaned us some money and I told him the only thing we could give him was to set aside an interest in the well, where if it ever came to anything, and upon due application the thing to be issued to him would be worth his while if the thing came in."

The understanding or misunderstanding of the parties as to the nature of the transaction is not determinative of its legal effect. However innocent in one sense may have been the defendants' intentions, their acts in entering into the contract were deliberate and it is by their acts and the language of the Corporate Securities Act that we must judge the legal consequences of those acts and the sufficiency of the evidence to sustain the judgment. (*People* v. *Rubens* (1936), 11 Cal. App.2d 576, 591-592 [54 P.2d 98, 1107]; *People* v. *Murphy* (1936), 17 Cal.App.2d 575, 585 [62 P.2d 592]; *cf. People* v. *Flumerfelt* (1939), 35 Cal.App.2d 495, 498 [96 P.2d 190].)

And in this criminal prosecution the state is not bound by the written provisions of the civil contract between the defendants and Moore. (*People* v. *Martin* (1894), 102 Cal. 558, 566 [36 P. 952]; *People* v. *Eiseman* (1926), 78 Cal.App. 223, 241 [248 P. 716]; *People* v. *Kelley* (1927), 81 Cal.App. 398, 403 [253 P. 773]; *People* v. *Robinson* (1930), 107 Cal. App. 211, 221 [290 P. 470].)

A "certificate of interest in an oil, gas or mining title or lease" is a security within the meaning of the Corporate Securities Act (Stats. 1937, p. 1429, § 2, par. (a), subd. 7). An instrument which evidences a fractional or percentage interest in oil and gas production is such a certificate of interest (*People* v. *Craven* (1933), 219 Cal. 522, 524 [27 P.2d 906]) and a permit is required for the issuance of such a certificate in a bona fide, private transaction (*Domestic & Foreign Pet. Co., Ltd.* v. *Long* (1935), 4 Cal.2d 547, 558 [51 P.2d 73]).

But, defendants urge, they did not issue a security to Moore; their transaction with him was an innocent "agreement to make a lawful attempt to dispose of an interest in a security." In this connection they emphasize that only such interest "as may be permitted" after "proper authorization" was agreed to be issued, and they call attention to Moore's testimony (a conclusion) that he never received a certificate;

that "all he gave me was a piece of paper." Under defendants' construction of the agreement, if the well was put on production and defendants applied for, but the commissioner refused, a permit, they would be in the peculiar situation of being obligated to "set aside" 5 per cent of the production for Moore yet being unable lawfully to pay or transfer such per cent to Moore. More realistically, if the defendants' venture was successful they would be required to apply for (and no doubt would obtain) a permit; if the venture was unsuccessful they would not be put to the trouble of seeking a permit. In *People* v. *Oliver* (1929), 102 Cal.App. 29, 36 [282 P. 813], an argument similar to that now under consideration was made. The District Court of Appeal said, "If the instrument of sale creates a present right to a present or a future participation in either the income, profits or assets of a business carried on for profit, it is a 'security' as defined in the Corporate Securities Act. Because the interest created will not return a profit until the performance of a future act, such as the sale of an interest in a patent, or the grant to a licensee of the right to use it, does not bring it without the provisions of this act. (*Agnew* v. *Daugherty,* 189 Cal. 446 [209 P. 34].) To hold otherwise would make the real test of the legality or illegality of the sale the ultimate success or failure of the venture. . . . It is the act of selling that is primarily placed under the examination of the commissioner of corporations, and his action in granting or withholding his permit to sell cannot be made contingent upon the future success or failure of the business venture."

Defendants further contend that the per cent of production here involved was not "sold" within the meaning of the Corporate Securities Act; that they agreed only to set it aside and later, when and if the well was completed, there would arise the further obligation to apply to the commissioner for permission to transfer the per cent. According to the act (Stats. 1937, p. 1429, § 2, par. (a), subd. 8) a sale includes "every disposition, or attempt to dispose, of a security or interest in a security for value. Any security given or delivered with, or as a bonus on account of, any purchase of securities or any other thing, shall be conclusively presumed to constitute a part of the subject of such purchase and to have been sold for value. 'Sale' . . . shall also include a contract of sale . . ., an attempt to sell, [etc.]." The per cent of production was disposed of within the meaning of the

quoted statutory provision. ''Dispose of'' means, among other things, ''to fix the condition, employment, etc., of; to direct or assign for a use'' and also ''To transfer to the control of someone else, as by selling; to alienate; part with; relinquish; bargain away.'' (Webster's New Int. Dict., 2d ed.) It is apparent that the 5 per cent interest in production of the well was assigned to a specified use by the agreement. It was not transferred to the immediate control of Moore, but it was bargained away; i. e., for an entire consideration of $5,000 the defendants issued their promissory note and agreed that the per cent, if it was ever transferred to anyone, was to be transferred to Moore.

 Defendants urge that the transaction was primarily and in substance a loan for which no permit was required under the provisions of subdivisions 10 and 11 of paragraph (b) of section 2 of the Corporate Securities Act (Stats. 1937, p. 1431). Subdivision 10 exempts from the provisions of the act ''promissory notes and other commercial paper issued, given or acquired in a bona fide way in the ordinary course of legitimate business,'' and subdivision 11 exempts ''Promissory notes, whether secured or unsecured, where the notes are not offered to the public, or are not sold to an underwriter for the purpose of resale.'' Defendants' promissory note and the quoted agreement were executed as parts of one transaction. The testimony of defendants themselves supports the implied finding that they made the agreement as to the per cent to induce Moore to make the loan rather than as an incidental matter subordinate to the loan. (*Cf. People* v. *Weibert* (1937), 18 Cal.App.2d 457, 469 [64 P.2d 169].) The fact that a promissory note was issued as part of the transaction does not in and of itself bring the entire transaction within either of the quoted exemptions.

 Both defendants and the People rely on the principle that the substance and not the mere form of a transaction determines its character. It is true that the courts of this state have often had occasion to hold that instruments variously phrased as assignments, options to purchase, grant deeds of·described land, etc., were certificates of interest in proceeds of oil leases, titles, or royalties. (*People* v. *Craven* (1933), *supra*, 219 Cal. 522, 524; *Domestic & Foreign Pet. Co., Ltd.*, v. *Long* (1935), *supra*, 4 Cal.2d 547, 554; *People* v. *Rubens* (1936), *supra*, 11 Cal.App.2d 576, 580-581; *People* v. *Jackson* (1937), 24 Cal.App.2d 182, 192 [74 P.2d 1085]; *People* v. *Daniels* (1938), 25 Cal.App.2d 64, 68 [76 P.2d 556];

*People* v. *Yant* (1938), 26 Cal.App.2d 725, 734-736 [80 P.2d 506]; *Moore* v. *Stella* (1942), 52 Cal.App.2d 766, 776 [127 P.2d 300].) It is also true that the principle applies where an instrument in form appears to be, but in substance is not, within the act. (*People* v. *Davenport* (1939), 13 Cal.2d 681, 690 [91 P.2d 892]; *Morello* v. *Metzenbaum* (1944), 25 Cal.2d 494, 498 [154 P.2d 670].) ▆ In the present case the trial court, upon conflicting but sufficient evidence, impliedly found that the transaction, in substance as well as in form, was within the act. The fact that the evidence amply admits of inferences that in its essential substance such transaction was not within the proscription of the act does not permit us to disturb the trial judge's determination.

▆ Defendants earnestly contend that the Corporate Securities Act, insofar as it requires that an individual must obtain a permit before he can issue and dispose of a security in a private transaction, violates the Fourteenth Amendment of the Constitution of the United States and sections 1 and 13 of article I of the California Constitution. They urge that the decision of this court to the contrary in *Domestic & Foreign Pet. Co., Ltd.,* v. *Long* (1935), *supra,* 4 Cal.2d 547, 558, should be overruled and that the reasoning of *People* v. *Pace* (1925), 73 Cal.App. 548, 558-563 [238 P. 1089] (which limits the right of the state to require the individual owner, who is neither issuer nor underwriter, of a security to obtain a permit to sell such security), applies with equal force and logic to the situation presented in the Long case and the present case. We are satisfied that the application of the Corporate Securities Act to a bona fide private transaction on the part of individuals, under circumstances such as those shown here, does not exceed the police power of the state. To hold otherwise would encourage those interested in evasion of the act to seek to disguise their operations as private "loan" transactions.

The trial court denied defendants' application for probation but the judgments, after sentencing defendants to imprisonment for one year in the county jail, recite that "The Court will consider suspending all or part of sentence if restitution is made within five days." (The $5,000 due on the note, as stated above, had not been paid in full.) ▆ The court had no power to suspend execution of sentence except as an incident to granting probation. (Pen. Code, §§ 1203,

1203.1; *In re Eyre* (1934), 1 Cal.App.2d 451, 453 [36 P.2d 842]; *People* v. *Wallach* (1935), 8 Cal.App.2d 129, 132 [47 P.2d 1071]; *Ellis* v. *Dept. of Motor Vehicles* (1942), 51 Cal. App.2d 753, 757 [125 P.2d 521].) ▮ A trial court has power to entertain an application for probation at any time prior to execution of sentence, before or after judgment is pronounced, and on the going down of a remittitur. (*Lloyd* v. *Superior Court* (1929), 208 Cal. 622, 630 [283 P. 931]; *People* v. *Superior Court* (1930), 208 Cal. 692 [284 P. 451].) It may, of course, impose conditions, such as the making of restitution, upon which probation is granted. (Pen. Code, § 1203.1; *People* v. *Lippner* (1933), 219 Cal. 395, 398 [26 P. 2d 457].) ▮ Although it has been held that a defendant is not, as a matter of right, entitled to have an application for probation considered after a previous application presenting the same issues has been denied (*People* v. *Payne* (1930), 106 Cal.App. 609, 615 [289 P. 909]), it appears from the wording of the judgments in this case and from certain remarks of counsel on the hearing of the application for probation that there was a misapprehension of judge and counsel as to the effect of denial of probation and that the matter of probation was considered as a question entirely separate from the matter of suspending sentence; thus an application for probation on the going down of the remittitur would present a question not determined on the previous application.

The judgments and order appealed from are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.

Appellants' petition for a rehearing was denied November 26, 1945.