[Crim. No. 5746. Second Dist., Div. Two. Oct. 4, 1957.]

THE PEOPLE, Respondent, v. CHARLES H. OTTERMAN, Appellant.

D. Wendell Reid for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

ASHBURN, J.—Having been charged with five violations of the Corporate Securities Act (Corp. Code, § 26104, subd. (a)) and a like number of grand thefts arising out of the same transactions, defendant was convicted by a jury upon two counts of each class. The victims were Richard E. Truett (counts I and II of the information) and Edmund A. Wanner (counts VI and VII). Defendant was granted probation but appeals from that order (Pen. Code, § 1237, subd. 1) and from an order denying his motion for new trial (Pen. Code, § 1237, subd. 2). ▉ He also attempted to appeal from the sentence, which cannot be made the subject matter of an appeal (*People* v. *Millum,* 42 Cal.2d 524, 525 [267 P.2d 1039]).

The violations of the Corporations Code as alleged were sales of securities without obtaining a permit from the Commissioner of Corporations so to do. The grand thefts consisted of procuring money from the respective victims for the purchase of such unauthorized securities under false representations consisting chiefly of a concealed intention not to use the money for the purpose for which it was delivered to defendant.

Except to the extent that they challenge the sufficiency of the evidence appellant's briefs do not comply with rule 15(a) of the Rules on Appeal, which requires each point to appear separately under an appropriate heading. ▉ In considering the claim of insufficiency of the evidence we "must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict." (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) In that light we shall consider first the charges arising under the Corporations Code and then those of grand theft.

Count I, dealing with Mr. Truett, charges sale and issuance by defendant of a security of his own issue, to wit, a preorganization subscription agreement for purchase of 2,500 shares of capital stock in a corporation to be organized and known as Pacific Pictures Corporation, and the receipt of $2,500 in payment for same without having applied for or received a permit so to do from the Commissioner of Corporations. In June, 1951, Mr. Truett read a newspaper ad-

vertisement which had been inserted by defendant and associates, reading as follows: "ASSOCIATE ALASKA MOTION PICTURE EXPEDITION Associate with $2,500 to join motion picture company sailing to Alaska and the Yukon Territory to film 13 motion pictures for TV. No experience necessary. Will be produced by well-known Hollywood Producer-Director with top Hollywood cast and technical staff. Returns on your investment should exceed $30,000. INVESTIGATE Box 4225, World-Herald." In the same month he contacted defendant Otterman who told him that he could go on a contemplated trip to Alaska for the making of television pictures if he would invest a minimum of $2,000. Defendant referred to the corporation as Pan Pacific Productions. They talked again in August and defendant said that Truett would receive Pan Pacific Productions stock for his money, Truett agreeing to invest $2,500.[1]

On August 27th Truett was taken by defendant to the office of defendant's attorney to close the deal and have appropriate papers drawn. There was no conversation about a loan and it was understood that Truett should receive 2,500 shares of stock for his money which would be deposited in escrow in the Hollywood State Bank (this was never accomplished). Part of the $2,500 had been paid to defendant on August 25th and the balance was delivered in Attorney Reid's office on the 27th. A promissory note for $2,500, payable on November 1, 1951, was then delivered to Truett who testified that he considered it a receipt for his money, he not having had previous experience in such business transactions. There was also prepared and executed at the same time an agreement between Truett and Otterman which starts with the statement that Truett agrees to lend the sum of $2,500 to Otterman on an unsecured promissory note to become due on November 1, 1951, and then says: "CHARLES H. OTTERMAN agrees to pay the said note, with interest, on or before November 1, 1951 in shares of stock in a certain corporation now being formed in San Francisco, California and tentatively known as 'Pacific Pictures Corporation,' the said payment to

[1]The evidence shifts from Pan Pacific Productions to Pan Pacific Productions, Inc., Pacific Pictures, Inc., Pacific Pictures Corporation, Film Enterprises, Inc. Mr. Truett testified: "The name Pacific Pictures was mentioned and eventually became Film Enterprises, and all of this happened in such a sequence that we never know which corporation we are talking about." Also, "[a]s I said before, the corporations were forming so fast and furiously, you never knew which stock you were talking about."

be made in shares of stock at the par value, or if no par value, at the stated value at the time of their issuance. It is agreed between the parties that if the said shares of stock are received by Charles H. Otterman prior to November 1, 1951, that upon the happening of this event the said shares will be transferred to Richard E. Truett immediately." This terminology shifts the deal from Pan Pacific Productions stock to that of a corporation "now being formed in San Francisco, California, and tentatively known as 'Pacific Pictures Corporation.'" Otterman told Truett at that time that that was a tentative name, the use of which would depend upon what happened when they applied "to get this corporation formed." Truett, on cross-examination, said it was possible that he drew the note but he did not remember who did it. The note and agreement apparently were typed on the same machine and it is conceded that the attorney dictated the agreement. This note device was used in other instances shown in the evidence and appears to have been part of the regular plan and procedure of defendant and his associates.

The Commissioner of Corporations never issued any permit with reference to Pacific Pictures Corporation or Pacific Pictures, Inc., or Pan Pacific Productions, and had no such applications. He did issue, on August 28, 1951, a permit to Pan Pacific Productions, Inc., to issue not more than 1,000 shares of stock at $10 each to Otterman, Brydon B. Baker and D. Wendell Reid, and required that same be held in escrow until released by further order of the commissioner; there was never any permit to sell the same to the public. The original agreement to sell 2,500 shares of Pan Pacific Productions (or Pan Pacific Productions, Inc.) was therefore violative of the statute, as was also the written agreement to sell shares of the corporation "now being formed."

While a preincorporation subscription agreement may be made without a prior permit (Corp. Code, § 25153), the statute provides that such agreement is made and accepted upon condition that the company be incorporated within 90 days, and when incorporated shall with reasonable diligence apply for and secure from the commissioner a permit authorizing the issue of the shares so subscribed in accordance with such subscriptions, and expressly forbids the collection of any portion of the consideration to be paid on account of such subscription unless and until a permit has been issued by the commissioner authorizing such collection. It does not

appear that Pacific Pictures Corporation was ever incorporated, the inference from all the evidence is to the contrary. If the incorporation was completed there was no compliance with the requirement of an application for a permit made with reasonable diligence. Finally the purchase price was collected immediately, which was a violation of the statute. Plainly, that was the unlawful result of defendant's agreement with Mr. Truett. (See *Randall* v. *Beber,* 107 Cal. App.2d 692, 699-700 [237 P.2d 994]; *Miller* v. *California Roofing Co.,* 55 Cal.App.2d 136, 141 [130 P.2d 740]; *Olds* v. *Simmons,* 123 Cal.App. 275, 279 [11 P.2d 36]; *Los Angeles Transfer Co.* v. *Ritz Carlton H. Co.,* 7 Cal.App.2d 154, 158 [46 P.2d 186]; *People* v. *Jaques,* 137 Cal.App.2d 823, 831-833 [291 P.2d 124]; *Sampson* v. *Sapoznik,* 124 Cal.App.2d 704, 708 [269 P.2d 205]; *Bourke* v. *Frisk,* 92 Cal.App.2d 23, 27-28 [206 P.2d 407].)

The burden of the defense is that the $2,500 received from Truett by defendant was a loan and hence not within the Corporate Securities Act; that the provision of the agreement for payment in corporate stock was but an option conditioned upon its valid issuance and hence not violative of the statute. This option argument finds no support in the document and the jurors were warranted in rejecting any oral evidence to that effect. The claim of a loan was flatly refuted by the testimony of Truett and was inferentially rejected by the jury and by the trial judge who denied the motion for new trial. The documents bear the earmarks of subterfuge. The casting of a stock deal into the form of a mere note transaction cannot escape the interdiction of the statute.

*People* v. *Sidwell,* 27 Cal.2d 121 [162 P.2d 913], is determinative. In that instance the parties used a promissory note and an agreement which stated that "this transaction does not constitute a sale or a purchase of the above described 5% interest" (p. 124), but that "proper application will be made through proper authorization upon completion of said . . . well to have such interest duly issued and placed in your name or such nominee as you may designate under permissive authority." (P. 124.) The court said, at page 126: "The understanding or misunderstanding of the parties as to the nature of the transaction is not determinative of its legal effect. However innocent in one sense may have been the defendants' intentions, their acts in entering into the contract were deliberate and it is by their acts and the language of the Corporate Securities Act that we must judge the legal

consequences of those acts and the sufficiency of the evidence to sustain the judgment. [Citations.] ██ And in this criminal prosecution the state is not bound by the written provisions of the civil contract between the defendants and Moore. [Citations.]'' ██ At page 128: ''Defendants' promissory note and the quoted agreement were executed as parts of one transaction. The testimony of defendants themselves supports the implied finding that they made the agreement as to the per cent to induce Moore to make the loan rather than as an incidental matter subordinate to the loan. (*Cf. People* v. *Weibert* (1937), 18 Cal.App.2d 457, 469 [64 P.2d 169].) The fact that a promissory note was issued as part of the transaction does not in and of itself bring the entire transaction within either of the quoted exemptions.'' At page 129: ''In the present case the trial court, upon conflicting but sufficient evidence, impliedly found that the transaction, in substance as well as in form, was within the act. The fact that the evidence amply admits of inferences that in its essential substance such transaction was not within the proscription of the act does not permit us to disturb the trial judge's determination.''

*People* v. *Whelpton,* 99 Cal.App.2d 828 [222 P.2d 935], also deals with an attempt to disguise the sale of the security as an innocuous loan. The purchasers were told that if defendants got oil production they would refund the money and the receipt therefor could be turned in for shares of stock. Speaking through Mr. Justice McComb this court said, at page 831: ''The circumstances pertaining to these transactions, to wit, the written statements in each receipt that the money was a 'loan to Chino Hills Oil Co.'; the representations by the defendants as part of the transactions that the investors' money could be used for the purpose of buying stock in the company, was a 'sale' of a 'security' as these words are defined in the Corporate Securities Law. A share of stock is a 'security' and a 'sale' includes an offer to sell, an attempt to sell, a solicitation of sale, an option to sell or a contract to sell. . . . Under the law defendants' statements to the investors that their receipts or loans might be used to buy stock in the corporation was a sale under the circumstances of this case.

''There is no merit in defendants' contention that since the receipts which were issued indicated on their face that the transaction in each instance was a loan the transactions were

exempt from the Corporate Securities Law under section 25102(c) (formerly Corporate Securities Act, § 2, para. (b), subd. 11 [Stats. 1937, p. 1431]).

"Such receipts, it is apparent when considered in connection with the other evidence received, were mere subterfuges for the purpose of avoiding the other provisions of the act. In effect the investors were told that by loaning money at that time they would be given stock when the oil well was placed upon production. . . .

". . . Defendants violated the act when they gave the investors an option to buy stock in the corporation in consideration of their making purported loans to it. (*People* v. *Boles,* 35 Cal.App.2d 461, 463 [95 P.2d 949].)"

Appellant argues that Truett's testimony that this was not a loan must be rejected because he accepted a promissory note and signed an agreement stating that he agreed to loan defendant $2,500; that he is a college graduate of mature years whose testimony that he thought the note was but a receipt must be rejected because it is inherently improbable. ■ That rule has no application here, for "[t]o come within the rule of inherent improbability the testimony must be such that it is physically impossible for it to be true, or its falsity must be apparent without resort to inference or deduction." (*People* v. *Frankfort,* 114 Cal.App.2d 680, 700 [251 P.2d 401].) ■ Appellant's argument is but an invitation to this court to weigh the evidence, a thing we cannot do when it appears, as here, that there is substantial evidence supporting the implied findings of the jury.

■ The fact, if it be one, that Truett prepared the $2,500 promissory note (a thing to which no witness affirmatively testified) is immaterial. The doctrine of *pari delicto* does not apply to criminal prosecutions. (*People* v. *Hall,* 133 Cal.App. 40, 45 [23 P.2d 783]; *People* v. *Martin,* 102 Cal. 558, 563-564 [36 P. 952]; *People* v. *Howard,* 135 Cal. 266, 271 [67 P. 148]; *People* v. *Ward,* 134 Cal. 301, 309 [66 P. 372].)

The evidence supports the conviction upon count I of the information.

With respect to Edmund A. Wanner the charge is sale and issuance of a security of defendant's own issue, to wit, an option agreement entitling him to purchase shares of capital stock of Film Enterprises, Inc., without first applying for and receiving from the Commissioner of Corporations a permit so to do. The corporation known as Film Enter-

prises, Inc. was formed after the commissioner had denied an extension of time on the permit of Pan Pacific Productions, Inc., and had ordered the return to investors of moneys which had been placed to their credit in an escrow in the Hollywood State Bank. Its articles were filed on October 24, 1951, and it procured on January 23, 1952, a permit to sell 114,000 shares of stock at one dollar each, subject to impounding in escrow the first $50,000 of purchase money received.

After seeing an advertisement similar to the one quoted above, and after certain preliminary conversations in which Otterman told him that investors could go on location during the taking of pictures, which meant a boat trip to Alaska or Hawaii or the like, Wanner asked Otterman if there was any stock available for sale and was told that all of it had been sold. On a later visit, when the inquiry was renewed Mr. Bishop, the general manager of the corporation, was present and he said that defendant could sell Wanner some of his own 7,000 shares of stock. Defendant also said that he had 7,000 shares. Two days later Wanner told defendant he would purchase 1,500 shares of stock. These conversations pertained to Film Enterprises, Inc. On December 19, 1951, Wanner delivered a check for the purchase price to Otterman and received from him by way of a receipt a 30-day promissory note for $1,500. There had been no talk about a loan and Wanner testified that the $1,500 was in payment for stock. Truett, his friend, had originally discussed the investment with him and about nine days after paying for the stock and receiving the note Wanner asked defendant for the same agreement he had given to Truett. Defendant obtained a mimeographed form from the files, filled in the blanks, and the two of them executed an agreement similar to the one given Truett.[2] However, the agreement is that the note shall be paid "in lawful money of the United States or at the option of the payee to pay said note in shares of stock at par value if and when issued to the maker in Film Enterprises, Inc." The document also provides that if the shares are received by January 28, 1952, "upon the happening of this event the said shares will be transferred to Edmund A. Wanner immediately at his option." The previous oral agreement was one for a flat sale. This further instrument, cast in the form of an option to buy shares was made before any permit had

---

[2] It was dated December 28, 1952, but was intended to read 1951, as its context shows.

been issued to the named corporation, Film Enterprises, Inc. The application was then pending, having been filed on November 2, 1951. ▇▇▇ An option to buy stock is included in the definition of sale found in the act. (Corp. Code, § 25009.) What has been said heretofore about the use of a note as a badge of legality is equally applicable here. The evidence sustains a finding of a violation of the statute as alleged in count VI.

When defendant received the purchase price of the shares bought by Truett and Wanner he appropriated the money to his own use contrary to his agreement, and out of this fact grow the charges of grand theft. In each instance it was agreed that the money paid defendant for the stock should go into escrow to be used for the purchase of the stock subject to the further order of the Commissioner of Corporations. In the Truett instance the escrow was in the Hollywood State Bank. In that of Wanner it was in the Anglo-California Bank in San Francisco. None of the money found its way into escrow. Truett's check was deposited to the bank account of Pan Pacific Productions, Inc., and then used by defendant out of that fund. Appellant's reply brief says: "The Defendant does not deny that he placed this $2,500.00 in his own bank account. Where else would he place it if he borrowed it?" Wanner's check of December 19th ran directly to defendant who endorsed it and deposited same to his own account in Security-First National Bank on December 20th. The promise to deposit the moneys of Truett and Wanner in escrow and to use it for purchase of stock was not performed. The money was promptly diverted to defendant's personal use and neither Truett nor Wanner ever received any stock or any repayment of his money.

▇▇▇▇▇▇ While mere nonperformance of a promise is not enough to constitute a fraudulent pretense within the law of grand theft (*People* v. *Ashley,* 42 Cal.2d 246, 263-264 [267 P.2d 271]), a promise made with intent not to perform does constitute a false pretense (*People* v. *Weitz,* 42 Cal.2d 338, 343 [267 P.2d 295]), and the question of intent to defraud is one of fact (*People* v. *Frankfort, supra,* 114 Cal.App.2d 680, 697-698); the nonperformance is a circumstance to be considered with all others in deciding whether the intent to perform was absent at the time of making the promise. (See *People* v. *Frankfort, supra,* at p. 698; *People* v. *Rocha,* 130 Cal.App.2d 656, 661 [279 P.2d 836]; *People* v. *Pond,* 44 Cal.2d 665, 672 [284 P.2d 793].) ▇▇▇ Moneys received from

numerous other investors were placed in escrow as agreed and were held there until returned to them pursuant to order of the Corporation Commissioner. The difference in treatment of the Truett and Wanner moneys is in itself significant. Wanner was listed in the escrow as a subscriber to stock but his money was never placed therein. Truett was not included in the list of subscribers, although he was asked and agreed to release from the Hollywood State Bank escrow money which he believed to be on deposit to his credit. The circumstances at bar are sufficient to support the jury's finding of an existing fraudulent intent not to use the money of either victim for the purpose for which it had been delivered.

 The charge of theft (Pen. Code, § 484) may be supported by proof of obtaining money by false pretenses or by trick and device, proof of embezzlement or the commonly accepted forms of larceny. "Larceny by trick and device is the appropriation of property, the possession of which was fraudulently acquired; obtaining property by false pretenses is the fraudulent or deceitful acquisition of both title and possession." (*People* v. *Ashley, supra,* 42 Cal.2d 246, 258.) "That statute makes one family of larceny, embezzlement, fraudulent appropriation, false pretenses under one generic name of *theft.*" (*People* v. *Sears,* 124 Cal.App.2d 839, 851 [269 P.2d 683].)

 The facts above summarized would warrant a finding of obtaining the money of Truett and of Wanner by trick and device, that is to say, by obtaining possession for application to a particular use with a preconceived design to appropriate the same to defendant's own use. *People* v. *Bartges,* 126 Cal. App.2d 763, 770 [273 P.2d 49] : "The evidence in this case as hereinbefore narrated is amply sufficient to justify a finding by the jury of larceny by trick and device. Without again setting forth the evidence in detail, suffice it to say that it clearly shows that appellant, with a preconceived design to appropriate the money to his own use, obtained possession of it by means of fraud and trickery. The fraud vitiated the transaction and the owner is deemed still to retain a constructive possession of the property. The owner does not part with title to the alleged thief where, as here, he delivered it to appellant to be applied by the latter to a particular purpose and the recipient, having obtained possession with the preconceived intention to appropriate the money to his own use, subsequently did convert it to his own use instead of applying it to the purpose contemplated by the owner." To the same

effect see *People* v. *Kirsch,* 204 Cal. 599, 602 [269 P. 447];
*People* v. *Owens,* 117 Cal.App.2d 121, 123 [255 P.2d 114];
*People* v. *Sears, supra,* 124 Cal.App.2d 839, 853; *People* v.
*Chamberlain,* 96 Cal.App.2d 178, 182 [214 P.2d 600]; *People*
v. *Gilliam,* 141 Cal.App.2d 749, 758 [297 P.2d 468].

■ The facts would also sustain a finding of theft through
embezzlement. That term is defined in section 503, Penal
Code: "Embezzlement is the fraudulent appropriation of
property by a person to whom it has been entrusted." Sec-
tion 484, defining theft, includes the phrase "or who shall
fraudulently appropriate property which has been entrusted
to him." In *People* v. *Fewkes,* 214 Cal. 142, 148-149 [4 P.2d
538], it is said: "There was evidence which the jury was
entitled to believe that the defendant told the prosecuting
witness that her money would be turned over to the corpora-
tion and that she would receive the shares of stock therefor.
It is a reasonable if not necessary deduction from the evidence
that the defendant received the money as the agent and trustee
of the complaining witness to be used for the particular pur-
pose intended. Assuming that he originally received it for
that purpose without fraudulent design, the fact that he ap-
propriated it to his own use after he received it and without
the knowledge and consent of the complaining witness would
be a circumstance from which the fraudulent intent could
be inferred. . . . The evidence in this case established grand
theft in the form of embezzlement." See also *People* v.
*Pierce,* 110 Cal.App.2d 598, 604-605, 609 [243 P.2d 585].
Truett and Wanner entrusted their funds to defendant to be
placed in escrow for purchase of stock when funds were re-
leased by the commissioner for that purpose; defendant im-
mediately diverted those moneys to his own use. That was
embezzlement.

It is not incumbent upon us to weigh or further discuss
the contradictory evidence and inferences deducible from a
1200-page transcript. It is enough to know that evidence of
substantiality supports the findings of the jury that defendant
is guilty of the charges of counts I, II, VI and VII of the
information.

Intermingled with arguments upon sufficiency of the evi-
dence appellant asserts various errors in the trial. One of
them will be discussed, though not properly presented.

Three of the counts of the information related to trans-
actions with Harold Merz. One of them was dismissed and
defendant was found not guilty upon the other two. ■ Evi-

dence concerning similar transactions with investors Melnyk, Lindner and Hayward was received over objection for a limited purpose which was carefully and repeatedly explained to the jury. At the close of the case defendant unsuccessfully moved to strike all this evidence including that pertaining to Merz. He now contends there was error in receiving the evidence and in refusing to strike it. This evidence and appellant's argument revolve around the prosecutor's proof of falsity of Otterman's representation to Wanner that he had subscribed for 7,000 shares of Film Enterprises, Inc., and could and would sell 1,500 of those shares to Wanner. The escrow holder's records showed Otterman to have subscribed for 3,000 shares and no more. However, the amended application for permit filed on behalf of that same corporation on January 7, 1952 (after receipt of Wanner's money) lists Otterman and wife as subscribers for 7,500 shares. Defendant himself having asserted that he had made a subscription and had a right to receive that number of shares, the district attorney undertook to show falsity of the representation by proof that defendant had used the money of other investors to make a subscription in his own name and that he did not actually own any such shares or the right to same, even upon the assumption that he had already made the subscription at the time of the representation to Wanner. By an expert witness the prosecutor traced through a complicated series of transactions and records the moneys of said investors Merz, Melnyk, Lindner and Hayward into the sum which Otterman had deposited with the Anglo-California Bank as escrow holder of Film Enterprises, Inc., stock. As previously stated, the court received the evidence for the limited purpose of proving the contention that defendant had no right in himself to receive any stock of said corporation and hence nothing in the way of a subscription right which he could sell to Wanner. Appellant's claim that this evidence was improper has no substantial basis. It was proof of falsity of a representation made by defendant to Wanner and hence directly responsive to the main issue of count VII.

It also would have been properly received without limitation, for it disclosed the use of notes, purchase agreements, sales of stock in Pan Pacific Productions, Inc. and Film Enterprises, Inc., without the sanction of a commissioner's permit, and was proper as independent evidence of a common plan, pattern and system bearing directly upon defendant's intent to evade the Corporate Securities Act or

to misappropriate money entrusted to him by investors in the corporate stock. "Evidence of other crimes is not admissible when it[s] sole effect is to show a criminal disposition, but if it 'tends logically and by reasonable inference to establish any fact material for the prosecution, or overcome any material fact sought to be proved by the defense, [it] is admissible although it may connect the accused with an offense not included in the charge.' (*People* v. *Woods*, 35 Cal.2d 504, 509 [218 P.2d 981] ; see *People* v. *Citrino*, 46 Cal.2d 284, 288 [294 P.2d 32].)" (*People* v. *Riser*, 47 Cal.2d 566, 578 [305 P.2d 1].) In *People* v. *Thorne*, 10 Cal.2d 705 [76 P.2d 491], the court in upholding the introduction of evidence of other crimes said, at page 708: "As stated, the evidence complained of tends to establish a common scheme or plan and the testimony of the witness Merritt was therefore admissible as tending to show that the theft of which defendant here stands convicted was committed by him as a part of his scheme or plan, and this whether it be regarded as theft by false pretenses or theft by trick and device." The same rule was applied in *People* v. *Dutton*, 41 Cal.App.2d 866, wherein the court said, at 872 [107 P.2d 937] : "But we think the evidence, even if it be conceded that it referred to other offenses, was nevertheless admissible to show the intent, motive, system or scheme by and through which appellant operated his enterprise to evade the Corporate Securities Act. [Citations.] In cases of this kind one of the essential facts admissible is the defendant's plan or design to do the act with which he is charged. Such a plan may be evidenced by his conduct, and such conduct may consist of other similar acts." If there was any error in this phase of the case it consisted of the limitation of the purpose of the evidence, a ruling more favorable to defendant than he was entitled to have and hence not prejudicial.

Other rulings of which appellant complains were not erroneous, certainly not prejudicial. There is no foundation to the claim of misconduct on the part of the judge.

The attempted appeal from the sentence is dismissed. The judgment (order granting probation) and the order denying a new trial are affirmed.

Moore, P. J., and Fox, J., concurred.

A petition for a rehearing was denied October 25, 1957.