Filed 11/4/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B300163 |
| | (Super. Ct. No. F000270432002) |
| Plaintiff and Respondent, | (San Luis Obispo County) |
| v. | |
| OSCAR ARMANDO GARCIA, | |
| Defendant and Appellant. | |

A violent criminal street gang, Paso 13, gave a "green light" to kill Raul Mosqueda, a past associate of Paso 13 who was friendly with members of a rival gang. Mosqueda was subsequently assaulted by seven persons, including two members and one associate of Paso 13. Appellant Oscar Armando Garcia, a member of the gang, participated in the assault. The attackers punched and kicked Mosqueda until he lay helpless on the floor. Appellant directed the other gang member, David Rey, to stab the victim. Rey fatally stabbed Mosqueda four times in the chest. While Mosqueda was dying on the floor, appellant taunted him. Although this could have been a first degree murder, appellant was convicted by a jury of second degree murder.

Appellant was convicted in 1998. Pursuant to a new statute, Penal Code section 1170.95,[1] in 2019 appellant filed a petition to vacate his murder conviction. He sought an evidentiary hearing at which the prosecution would have the burden of proving, beyond a reasonable doubt, that he was ineligible for relief. (*Id.*, subd. (d)(3).) Appellant alleged that he 1) "did not, with the intent to kill, aid [or] abet . . . the actual killer"; 2) was not a "major participant" in the murder; 3) did not act with "reckless indifference to human [life]"; and 4) could not presently be convicted of murder.

Appellant's allegations conflict with the evidence presented at trial. As we shall explain, the Legislature surely did not intend that appellant would be entitled to an evidentiary hearing to retry the underlying criminal case against him. We affirm the order denying his petition.

*Procedural Background*

In 1998 appellant was convicted by a jury of second degree murder under the natural and probable consequences doctrine. (§§ 187, subd. (a), 189.) He was also convicted of conspiracy to commit assault by means of force likely to produce great bodily injury. (§§ 182, subd. (a)(1), 245, subd. (a)(1), now (a)(4).) The jury found true an allegation that he had committed the murder for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) He was sentenced to prison for 15 years to life. In a 2001 nonpublished opinion, *People v. Garcia et al.* (July 23, 2001, B126854) (*Garcia*), we affirmed the judgment of conviction as to appellant and his codefendants: Sergio Ortiz, David Rey, Gregory Vived, Jr., and Monte Weatherington.

---

[1] All statutory references are to the Penal Code.

Section 1170.95 was added to the Penal Code by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (S.B. 1437), which became effective on January 1, 2019. (See Stats. 2018, ch. 1015, § 4.) If a defendant has previously been convicted of murder under the felony-murder rule or the natural and probable consequences doctrine and qualifies for relief under section 1170.95, the new statute permits the defendant to petition to vacate the conviction and obtain resentencing on any remaining counts. One of the criteria for relief is that the defendant could not presently be convicted of murder because of changes made by S.B. 1437. (§ 1170.95, subd. (a)(3).) To obtain the evidentiary hearing appellant seeks, he must make a "prima facie showing" that he satisfies the statutory criteria. (*Id.*, subd. (c).)

The trial court denied the petition because appellant had failed to make a prima facie showing that, as a result of changes made by S.B. 1437, he could not presently be convicted of murder. (§ 1170.95, subds. (a)(3), (c).) We conclude that appellant's showing did not rise to the required "prima facie" level. The statement of facts in our 2001 opinion establishes that, after the effective date of S.B. 1437, appellant could be convicted of second degree murder as a direct aider and abettor of the killing of Mosqueda. Our conclusion is based on evidence that appellant directed the actual killer, David Rey, to stab the victim. We reject the Attorney General's concession "that the denial of appellant's petition should be reversed" because he made the requisite prima facie showing.

### *Holding*

We hold that where, as here, the record of conviction contains substantial evidence based on which a reasonable trier of fact could find the petitioner guilty of murder beyond a

3

reasonable doubt under current law despite the changes made by S.B. 1437, the petitioner has failed to carry his burden of making a prima facie showing that he could not presently be convicted of murder because of changes made by S.B. 1437. (§ 1170.95, subds. (a)(3), (c).) The petition must be denied even though the assertions in the petition, if true, would satisfy the statutory criteria for relief.

*Facts*

The facts are taken from the statement of facts at pages 2-5 of our nonpublished 2001 opinion, which was attached as "Exhibit A" to appellant's petition:

"Paso Robles 13 (Paso 13) is a criminal street gang. Mosqueda, whose moniker is 'dreamer,' was a past associate of Paso 13. Mosqueda was friendly with the members of Nameless Crew Style (NCS), a rival gang that was engaged in 'warfare' with Paso 13. . . . Paso 13 put out a 'green light' on Mosqueda, which meant that he was 'free game' to kill. [David] Rey and [appellant] were members of Paso 13, and [Sergio] Ortiz associated with the gang.

" [¶] [¶]

"During the evening of April 12, 1998, Reginald Calhoun went to the trailer park residence of Ortiz and [Monte] Weatherington. [Appellant and other persons were present] there. Mosqueda became the subject of conversation, and everyone was saying, 'Hey, we want to kick dreamer's ass.'

"Calhoun was paged by [Gregory] Vived[, Jr.]. Calhoun telephoned Vived, who said that Mosqueda was going to be at a party in Paso Robles. . . .

"Calhoun, [Manuel] Preciado, and [other persons, including appellant,] drove to the Paso Robles party in three cars. Rey was

4

the sole passenger in a car driven by [appellant].  *Rey was armed with a knife that he displayed to [appellant] inside the car*.  [Italics added.]  Rey put the knife in his pocket.  At the trailer park, Rey had not displayed the knife or mentioned that he possessed it.

"After parking their cars in Paso Robles, Calhoun, Preciado, and [other persons, including appellant,] walked to the apartment where the party was occurring.  Weatherington knocked on the front door.  A female opened the door, and Weatherington asked to speak to 'dreamer.'  Mosqueda came to the door and said, 'What do you guys want?'  Weatherington told him to come outside.  Mosqueda said, 'We don't want no problems here.'  Mosqueda closed the door, and another person locked it.  Calhoun picked up a potted plant and threw it through a plate-glass window.  Rey and Weatherington kicked the front door open.  Calhoun, Preciado, and [other persons, including appellant,] ran through the doorway into the apartment.  They were saying, 'Get your beating like a man,' and 'You know what time it is.  You know it's up.'  Everyone inside 'just started scattering.'  Mosqueda retreated into a bathroom and tried to close the door.  Calhoun testified that he and Rey pulled Mosqueda out into the hallway, but other witnesses testified that Weatherington did the pulling.  Calhoun and [other persons, including appellant,] punched Mosqueda in the hallway.  There was 'a big commotion of bodies' and people were screaming.

" [¶]

"Mosqueda fell to the floor and was lying on his side against a wall.  [Appellant] said to Rey, '*You got a knife.  You got*

5

*a knife. Stick him. Stick him.*' [Italics added.[2]] Rey stabbed Mosqueda four times in the chest. Mosqueda crawled out of the hallway 'like a baby' on his hands and knees with blood on his face, chest, and stomach. Rey, Vived, [appellant], Ortiz, and Calhoun were 'around him' and were punching and kicking him. People in the background were saying, 'Leave him alone. He's knocked out.['] Mosqueda fell to his side. Rey, Vived, [appellant], Ortiz, and Calhoun continued to hit and kick him. [Appellant] said, 'Now what's up dreamer? . . . Now you ain't talking. You're not saying nothing now, are you?' . . .

"Later that night, Preciado, Ortiz, and Weatherington met [appellant] in a parking lot. [Appellant] told them that Rey had stabbed Mosqueda 'penitentiary style, real quick,' and that anyone who said 'anything to the cops' would 'get bumped off' in prison. [Appellant] said that Rey 'had got his stripes.' This meant that Rey had earned respect from other gang members and 'was up at the top with the big boys . . . .'

" [¶]

"An expert on criminal street gangs testified that the killing of Mosqueda had benefited Paso 13 because it had 'slowed down' the escalation in violence between Paso 13 and NCS and had 'put [Paso 13] back on top.'"

---

[2] During closing argument to the jury, the prosecutor emphasized appellant's statement: "Reggie Calhoun . . . saw [appellant] there hitting Raul Mosqueda, and he heard [appellant] say, 'Stick him, stick him.'" Calhoun testified under a grant of immunity. During closing argument, appellant's counsel said: "In order to rise to the level of second-degree murder, there has to be an intent to kill . . . . The only thing . . . that's in evidence relative to [appellant] in that regard, . . . is the alleged statement, 'Stick him, stick him.'"

*Trial Court's Ruling*

The trial court considered the statement of facts in our 2001 opinion. It ruled that appellant was not eligible for relief because he had failed to make a prima facie showing that, as a result of S.B. 1437's changes to the Penal Code, he could not presently be convicted of second degree murder. The court said, "I'm taking into consideration that [appellant] was aware of the knife that was used by Mr. Rey in perpetration of the . . . stabbing; [and] that [appellant] purportedly said, 'stick him, stick him' during the stabbing or prior to the stabbing . . . ."

*S.B. 1437*

"Under the felony-murder rule as it existed prior to Senate Bill 1437, a defendant who intended to commit a specified felony could be convicted of murder for a killing during the felony, or attempted felony, without further examination of his or her mental state. [Citation.] . . . [¶] Independent of the felony-murder rule, the natural and probable consequences doctrine rendered a defendant liable for murder if he or she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense committed murder (a nontarget offense) that, even if unintended, was a natural and probable consequence of the target offense. [Citation.]" (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247-248; see also *People v. Chiu* (2014) 59 Cal.4th 155, 158 ["'under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted"'"].)

In S.B. 1437 the Legislature declared, "It is necessary to amend the felony murder rule and the natural and probable

7

consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) To achieve this goal, S.B. 1437 amended section 189, insofar as it pertains to the felony-murder rule, to add subdivision (e), which provides: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: (1) The person was the actual killer. (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (Stats. 2018, ch. 1015, § 3.)

S.B. 1437 also amended section 188 to add subdivision (a)(3), which provides, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (Stats. 2018, ch. 1015, § 2.) The Legislature declared, "A person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (*Id.*, § 1, subd. (g).) Because of the amendment of section 188, an aider and abettor cannot be convicted of murder under the natural and probable consequences doctrine. (See *People v. Offley* (2020) 48 Cal.App.5th 588, 594 (*Offley*) ["The effect of the new law was to

8

eliminate liability for murder under the natural and probable consequences doctrine"].)

Section 1170.95, added by S.B. 1437, gives retroactive effect to the changes in sections 188 and 189. It provides, "A person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when" certain conditions apply. (§ 1170.95, subd. (a).) One of the conditions is that "[t]he petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made [by S.B. 1437] effective January 1, 2019." (*Id.*, subd. (a)(3).) The petition must include a declaration by the petitioner showing that he is eligible for the relief afforded by section 1170.95. (*Id.*, subd. (b)(1)(A).)

"The court shall review the petition and determine if the petitioner has made a *prima facie showing* that the petitioner falls within the provisions of [section 1170.95]. . . . If the petitioner makes a *prima facie showing* that he or she is entitled to relief, the court shall issue an order to show cause." (§ 1170.95, subd. (c), italics added.) "Within 60 days after the order to show cause has issued, the court shall hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner . . . ." (*Id.*, subd. (d)(1).) "At the hearing . . . , the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. . . . The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Id.*, subd. (d)(3).)

9

*Meaning of "Prima Facie Showing"*

Section 1170.95, subdivision (c) requires a petitioner to make a "prima facie showing" of entitlement to relief. "A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 851.) "'[P]rima facie evidence is that which suffices for the proof of a particular fact, until contradicted and overcome by other evidence. It may . . . be contradicted, and other evidence is always admissible for that purpose.'" (*In re Raymond G.* (1991) 230 Cal.App.3d 964, 972, quoting from *Vaca Valley & C.L. Railroad v. Mansfield* (1890) 84 Cal. 560, 566.) Thus, in determining whether the petitioner has made a prima facie showing of entitlement to relief under section 1170.95, the trial court is not required to accept the allegations in the petition as true. "It would be a gross misuse of judicial resources to require the issuance of an order to show cause [under section 1170.95, subdivision (c)] . . . based solely on the allegations of the petition, which frequently are erroneous, when even a cursory review of the court file would show as a matter of law that the petitioner is not eligible for relief." (Couzens, Bigelow & Prickett, Sentencing California Crimes (The Rutter Group Oct. 2019 update) § 23:51, p. 5.)

Section 1170.95, subdivision (c) suggests that a petitioner's allegations may be contradicted. The subdivision says, "The prosecutor shall file and serve a response within 60 days of service of the petition . . . ." The prosecutor's response would be of little utility if the trial court must take the petitioner's allegations at face value in determining whether he has made a prima facie showing of entitlement to relief.

*Standard of Review*

Whether a petitioner has made the requisite prima facie showing is a predominantly legal question. We therefore independently review the trial court's ruling that appellant failed to make a prima facie showing. (See *Smiley v. Citibank, N.A.* (1995) 11 Cal.4th 138, 146 ["Independent review is called for when the underlying determination involves a purely legal question or a predominantly legal mixed question"]; *State v. Ernst* (2005) 283 Wis.2d 300, 311 ["Whether a party has met the burden of establishing a prima facie case presents a question of law which we review de novo"].)

*The Trial Court Properly Considered the*
*Statement of Facts in our 2001 Opinion*

Appellant contends that, in ruling that he had not made a prima facie showing of entitlement to relief under section 1170.95, the trial court improperly relied on the statement of facts in our 2001 opinion. We disagree. At the evidentiary hearing conducted after the trial court has issued an order to show cause, "[t]he prosecutor and the petitioner may rely on the record of conviction . . . to meet their respective burdens." (*Id.*, subd. (d)(3).) It follows that, in determining whether the petitioner has made a prima facie showing of entitlement to relief, the court may consider the record of conviction. "A court of appeal opinion . . . is part of the appellant's record of conviction. [Citations.] Accordingly, it [is] proper for [us] to consider our [prior] opinion . . . in determining whether he had made a prima facie showing of eligibility for relief under section 1170.95 or whether he was ineligible for relief as a matter of law." (*People v. Verdugo* (2020) 44 Cal.App.5th 320, 333 (*Verdugo*), review granted Mar. 18, 2020, S260493; see also *People v. Lewis* (2020)

11

43 Cal.App.5th 1128, 1136, fn. 7, review granted Mar. 18, 2020, S260598 [for purposes of section 1170.95, "[t]he record of conviction includes a reviewing court's opinion"];[3] *People v. Trujillo* (2006) 40 Cal.4th 165, 180-181 ["an appellate court decision . . . can be relied upon to determine the nature of a prior conviction because it may disclose the facts upon which the conviction was based. [Citation.] We held in [*People v.*] *Woodell* [(1998) 17 Cal.4th 448, 457,] 'that appellate opinions, in general, are part of the record of conviction that the trier of fact may consider in determining whether a conviction qualifies under the sentencing scheme at issue' "]; *Woodell*, *supra*, at p. 457 ["If the appellate court did state the pertinent facts, a trier of fact is entitled to find that those statements accurately reflect the trial record"]; *People v. Hicks* (2014) 231 Cal.App.4th 275, 286 ["the appellate opinion is part of the record of conviction which the court properly used in determining defendant's eligibility" for resentencing under the Three Strikes Reform Act of 2012]; *In re*

---

[3] In *Lewis* the Supreme Court limited briefing and argument to two issues, only one of which is relevant to the present appeal: "May superior courts consider the record of conviction in determining whether a defendant has made a prima facie showing of eligibility for relief under Penal Code section 1170.95?" (*People v. Lewis* (Mar. 18, 2020, No. S260598) [2020 Cal. LEXIS 1946, at *1].) In *Verdugo* further action was "deferred pending consideration and disposition of a related issue in [*Lewis*]." (*People v. Verdugo* (Mar. 18, 2020, No. S260493) [2020 Cal. LEXIS 2057, at *1].) Pending review and filing of the Supreme Court's opinion, *Lewis* and *Verdugo* have "no . . . precedential effect, and may be cited for potentially persuasive value only." (Cal. Rules of Court, rule 8.1115(e)(1).)

*Richardson* (2011) 196 Cal.App.4th 647, 667 ["Our opinion on the 1992 evasion conviction stated petitioner's victims were occupants of a mobilehome that was damaged by petitioner's crash. Our opinion is evidence in the record of conviction that establishes the victims of the 1992 evasion conviction were not accomplices, and therefore the evasion conviction qualifies as a prior strike"].)

The trial court's consideration of our prior opinion's statement of facts was especially appropriate because the opinion was attached as "Exhibit A" to appellant's petition. In his declaration in support of the petition, appellant stated, "A version of the statement of the case and facts is attached hereto as Exhibit A."

*Jury Instructions*

The jury instructions set forth two theories upon which the jury could have convicted appellant of second degree murder: 1) he aided and abetted an assault likely to produce great bodily injury, and the murder of Mosqueda was a natural and probable consequence of that crime; 2) he conspired to commit an assault likely to produce great bodily injury, and the murder of Mosqueda "was a natural and probable consequence of the agreed upon criminal objective of that conspiracy." The jury was not instructed that it could convict appellant of murder if it found that he had directly aided and abetted the murder by telling Rey to stab Mosqueda. Thus, the jury necessarily convicted appellant of murder under the natural and probable consequences theory, which is no longer a valid theory because of S.B. 1437's amendment of section 188. (*Offley*, *supra*, 48 Cal.App.5th at p. 594.)

13

The jury instructions show that appellant satisfied the first criterion for section 1170.95 relief – he was "convicted of . . . murder under a natural and probable consequences theory." (*Id.*, subd. (a).) The instructions do not show that he made a prima facie showing of the last criterion – he "could not be convicted of . . . murder because of changes to Section 188 . . . made [by S.B. 1437] effective January 1, 2019." (*Id.*, subd. (a)(3).) The absence of a jury instruction on murder based on a theory of direct aiding and abetting does not mean that appellant could not presently be convicted of murder under this theory.

*Appellant Failed to Make a Prima Facie Showing that*
*He Could Not Be Convicted of Second Degree Murder*

Based on our 2001 opinion's statement of facts, under S.B. 1437 appellant could still be convicted of second degree murder because he directed Rey to stab Mosqueda. This makes appellant a direct aider and abettor of the killing. The natural and probable consequences doctrine does not apply to this class of defendants. "Liability for intentional, target offenses is known as 'direct' aider and abettor liability; liability for unintentional, nontarget offenses is known as the ""natural and probable consequences' doctrine."" (*In re Loza* (2018) 27 Cal.App.5th 797, 801.) "[S.B. 1437] did not . . . alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator.' [Citations.] One who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law." (*Offley, supra*, 48 Cal.App.5th at pp. 595-596.)[4]

_____

[4] CALCRIM No. 401 is the current jury instruction for direct aiding and abetting. It provides in relevant part: "To

14

In his declaration in support of the petition for relief under S.B. 1437, appellant claimed that he was not a direct aider and abettor. He alleged, "I was convicted of second degree murder pursuant to the natural and probable consequences doctrine . . . ." "I could not now be convicted of . . . second degree murder because of changes made [t]o Penal Code section 188 . . . ." "I did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder . . . ."

In reply to the People's opposition to the petition, appellant's counsel presented a factual scenario contrary to the statement of facts in our 2001 opinion: "During the assault, one of the attackers, Mr. Rey, stabbed the victim with a knife, causing death. [Appellant] had no knowledge that Mr. Rey was carrying a knife before the attack. At no point did [appellant] encourage Mr. Rey to 'stick' or 'stab' the victim. [Appellant] did not intend that the victim be killed."

The Attorney General recognizes that "[t]he evidence does not appear to support appellant's . . . contention . . . that he could not be convicted of murder under . . . amended section 188." The Attorney General explains: "The stabbing . . . was not spontaneous or accidental, but occurred only after appellant's

_____

prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: 1. The perpetrator committed the crime; 2. The defendant knew that the perpetrator intended to commit the crime; 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

15

encouragement and instigation and during a seven-to-one beating of the victim.  Based on this evidence, it is clear appellant was a direct aider and abettor who acted either with express malice, or at least with implied malice, i.e., he intended to perform an act he knew presented a danger to the life of another but acted in conscious disregard of that danger."

"However," the Attorney General continues, "there appears to be no reason why *as a matter of law* such a claim [appellant's claim that he could not be convicted of murder under amended section 188] must fail based on appellant's record of conviction . . . ."  "Here, neither the jury instructions nor the verdicts indicate that appellant was *necessarily* convicted of murder based on a theory of actual malice as required by . . . amended section 188 for a direct aider and abettor."  "The trial court's denial of appellant's petition was predicated on consideration of the facts of the crime and finding that he could nevertheless be convicted of murder under a currently valid theory.  Although that is the correct question, it necessarily involves the weighing of facts and evidence that must be done at a section 1170.95, subdivision (d)(3) evidentiary hearing[, which is conducted only after the petitioner has made a prima facie showing of eligibility]."  "In short, if . . . the superior court discovers that the record of conviction shows 'as a matter of law' that petitioner's averments are false and that he is ineligible for relief, an order to show cause must not issue.  [Citation.]  Otherwise, the superior court must issue an order to show cause and permit a hearing to determine the facts."  "[T]he trial court erred because the facts set forth in this Court's prior opinion did not demonstrate as a matter of law that appellant was ineligible."

16

The Attorney General has misconstrued section 1170.95. For purposes of determining whether a petitioner has made a prima facie showing of eligibility for relief, the statute does not require the trial court to accept the petitioner's averments unless "the record of conviction shows 'as a matter of law' that petitioner's averments are false and that he is ineligible for relief." The Attorney General is reading into the statute a limitation neither expressly nor impliedly required by its language. "Both [the California Supreme] [C]ourt and the high court have cautioned against reading into a statute language it does not contain or elements that do not appear on its face." (*Martinez v. Regents of University of California* (2010) 50 Cal.4th 1277, 1295.)

Section 1170.95 clearly and unambiguously requires a prima facie showing that the petitioner "*could not* be convicted of . . . second degree murder because of changes to Section 188 . . . ." (*Id.*, subd. (a)(3), italics added.) "Could" is "used . . . as an alternative to *can* suggesting less force or certainty." (Webster's 3d New Internat. Dict. (1981) p. 517.) In view of the evidence that appellant directed Rey to "stick" the victim with a knife, as a matter of law appellant could be convicted of second degree murder as a direct aider and abettor despite the changes to section 188.

The command to stab Mosqueda was given by appellant. He was the only person present who knew Rey had a knife. Rey displayed the knife to him while appellant was driving Rey to the Paso Robles party. Nevertheless, it is possible that the jury did not credit the witnesses who testified that they had heard

17

appellant say, "Stick him.  Stick him."[5]  It is also possible that the jury believed appellant made this statement but intended only to wound Mosqueda, not kill him.  But we should not speculate what the jury might have believed.  The jury neither expressly nor impliedly found that appellant did not harbor the specific intent to kill when he allegedly told Rey to stab Mosqueda.  In the absence of such a finding, appellant could be convicted of murder as a direct aider and abettor because a reasonable trier of fact could find beyond a reasonable doubt that he said, "Stick him.  Stick him," and that he intended to kill Mosqueda when he made this statement.

We need not resort, as the Attorney General claims, to a "weighing of facts and evidence" to reach this conclusion.  If the

_____

[5] In his opening brief appellant asserts:  "[I]n a chaotic scene populated by many people, a number of whom were involved in the assault and related fracases, only two witnesses claimed to have heard the damning statement.  One of these was Calhoun, a man who demonstrably 'hated' appellant, and had a history of antagonism towards him, including the witness' previous attack on appellant's car with a baseball bat. . . .  The other was Rey, the actual killer, who was upset at appellant for having identified him to police . . . ."  Calhoun and Rey both testified at trial.  During closing argument, appellant's counsel told the jury:  "The only other person [besides Calhoun] that says anything about that [appellant's alleged statement, 'Stick him. Stick him'] was David Rey.  I submit to you David Rey found a convenient reason and a way to try to spread some blame out."  "Mr. Rey never told a soul about that until the time of trial. . . . [¶]  If it was credible, why didn't Mr. Rey bring it up earlier?  Why didn't he say to anybody he heard it?  He only picked up on that after Mr. Calhoun testified, and that was a convenient thing for [Rey] to grab onto."

18

jury had been instructed on direct aiding and abetting and had based its murder conviction on this theory, the conviction would have been upheld on appeal because it would have been supported by substantial evidence. (See *People v. Stanley* (1995) 10 Cal.4th 764, 792 ["On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt"].) Since substantial evidence supports a murder conviction based on a direct aiding and abetting theory, appellant's conclusory allegations in his petition do not constitute a prima facie showing that he could not be convicted of murder based on this theory. No weighing of the evidence is involved in applying the substantial evidence test. (*People v. Marsh* (1959) 170 Cal.App.2d 284, 288; *People v. Otterman* (1957) 154 Cal.App.2d 193, 202.)

Our application of the substantial evidence test is supported by *People v. Duke* (2020) 55 Cal.App.5th 113. There, the court considered the nature of the prosecution's burden at the evidentiary hearing conducted after the petitioner has made a prima facie showing of eligibility for relief under section 1170.95. The court concluded: "The prosecution bears the burden 'to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (§ 1170.95, subd. (d)(3).) The primary requirement for eligibility for resentencing under section 1170.95 is that '[t]he petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.' (§ 1170.95, subd. (a)(3).) To carry its burden, the prosecution must therefore prove beyond a

19

reasonable doubt that the defendant *could* still have been convicted of murder under the new law—in other words, that a reasonable jury could find the defendant guilty of murder with the requisite mental state for that degree of murder.  This is essentially identical to the standard of substantial evidence, in which the reviewing court asks ' "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. . . .'" [Citation.]" (*Id*. at p. 123.)

We disagree with the following holding of *People v. Drayton* (2020) 47 Cal.App.5th 965, 968, relating to the petitioner's initial burden of making a prima facie showing:  "We conclude the trial court should accept the assertions in the petition as true unless facts in the record conclusively refute them as a matter of law.  If, accepting the petitioner's asserted facts as true, he or she meets the requirements for relief listed in section 1170.95, subdivision (a), then the trial court must issue an order to show cause." *Drayton* failed to take into consideration the substantial evidence test explained above.  The trial court should not accept the petitioner's assertions as true and issue an order to show cause if substantial evidence in the record supports a murder conviction under current law.  The petitioner's assertions need not be "conclusively refut[ed] . . . as a matter of law." (*Ibid*.)

Appellant's status as a direct aider and abettor is supported by evidence in addition to his statement, "Stick him. Stick him."  Appellant was a member of Paso 13, a criminal street gang.  According to the statement of facts in our 2001 opinion, "Paso 13 put out a 'green light' on Mosqueda," a former associate of the gang who was friendly with members of "a rival gang that was engaged in 'warfare' with Paso 13."  The "green light" "meant that [Mosqueda] was 'free game' to kill." (*Garcia, supra,*

20

B126854, at p. 2; see *People v. Parrish* (2007) 152 Cal.App.4th 263, 278 ["a gang member . . . may be made subject of a 'green light,' which . . . is authorization from authority figures in the gang to kill that person"].) Since Mosqueda had been "green-lighted" by Paso 13 and appellant was a member of the gang, it is reasonable to infer that appellant intended to kill Mosqueda when he directed Rey to stab the victim. In addition, since Rey was also a member of Paso 13 and therefore must have known that Mosqueda had been "green-lighted" by the gang, it is reasonable to infer that appellant believed that Rey would interpret his "stick him" command as an order to kill. The jury found true allegations that appellant and Rey had committed the murder for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).)

Moreover, appellant's conduct after the stabbing indicates that he harbored an intent to kill. Appellant must have seen Rey stab Mosqueda four times in the chest. Appellant said that Rey had stabbed Mosqueda "'penitentiary style, real quick.'" (*Garcia, supra*, B126854, at p. 4.) Although appellant should have known that Mosqueda was mortally wounded, he did not express shock or dismay. Instead, he taunted the dying Mosqueda. Appellant said, "'Now what's up dreamer? . . . Now you ain't talking. You're not saying nothing now, are you?'" (*Id*. at p. 4.) Later that night, appellant expressed unqualified approval of the killing: "[Appellant] said that Rey 'had got his stripes.' This meant that Rey had earned respect from other gang members and 'was up at the top with the big boys . . . .'" (*Id*. at p. 5.)

Appellant also could presently be convicted of murder under a theory of implied malice. "Implied malice does not require an intent to kill. Malice is implied when a person

21

willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)  S.B. 1437 did not repeal the law imposing criminal liability for implied malice murder.

Appellant willfully participated in a brutal gang assault upon a person who had been "green-lighted" by the gang.  He told another gang member to stab the victim.  The natural and probable consequences of appellant's acts were dangerous to human life, and the evidence supports a finding that he acted with conscious disregard for human life.  (See *People v. Guillen* (2014) 227 Cal.App.4th 934, 983-992 [evidence sufficient to convict jail inmates of implied malice murder because they participated in a brutal assault upon another inmate who was believed to be a despised child molester].)

If appellant has made a prima facie showing of entitlement to relief under section 1170.95, almost every defendant convicted of murder who, like appellant, "artfully pleads" his section 1170.95 petition in conclusory language, and who was not the actual killer, gets an evidentiary hearing where he can retry the case.  In evaluating whether or not a petitioner has made a prima facie showing, the trial court must utilize common sense.  It is not required to accept a petitioner's conclusory declarations that conflict with the evidence presented at trial.

There is a gatekeeping function to be performed here.  (See *Verdugo, supra,* 44 Cal.App.5th at p. 331 [section 1170.95 "indicates the Legislature's intent that the superior court perform a substantive gatekeeping function, screening out clearly ineligible petitioners before devoting additional resources to the

resentencing process"].) Once a petitioner makes a prima facie showing, the evidentiary gate is open since there appears to be no limit on retrying the case. The newly enacted statute allows the "prosecutor and the petitioner" to "offer new or additional evidence." (§ 1170.95, subd. (d)(3).) The burden is on the prosecutor to "prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Ibid*.)

The gate in the instant matter should remain closed. The ameliorative statute was not designed to benefit a gang member who participated in a brutal gang assault upon a helpless victim "green-lighted" by the gang and who, according to the trial testimony of percipient witnesses, directed the actual killer to stab the victim. Despite appellant's averment in his petition that he "did not, with the intent to kill, aid [or] abet . . . the actual killer," substantial evidence supports a murder conviction based on a direct aiding and abetting theory. Appellant therefore did not carry his burden of making a prima facie showing that he could not presently be convicted of murder because of changes to section 188 made by S.B. 1437.

*Conclusion*

In determining whether a petitioner has made a prima facie showing of entitlement to relief under section 1170.95, the courts should not ignore the evidence in the record of conviction that shows the petitioner is ineligible for relief. Where, as here, the record of conviction contains substantial evidence based on which a reasonable trier of fact could presently find petitioner guilty of murder despite the changes made by S.B. 1437, it would be a waste of judicial resources to require a full-blown evidentiary hearing at which the court may rely on the record of conviction. (§ 1170.95, subd. (d)(3).) Accordingly, the trial court

did not err in refusing to issue an order to show cause and conduct an evidentiary hearing.

*Disposition*

The order denying appellant's petition for relief under section 1170.95 is affirmed.

<u>CERTIFIED FOR PUBLICATION.</u>

YEGAN, J.

We concur:

GILBERT, P. J.

PERREN, J.

YEGAN, Concurring:

The Court of Appeal should not exalt form over substance and we should not require the Superior Court to participate in a "fool's errand." By "fool's errand," I mean that the goal is, in all probability, unattainable. In its zeal to "right" what it perceives is to be "wrong," the Legislature allows a retroactive, and theoretical remedy for some defendants convicted of murder. This has severe adverse consequences to the administration of justice. Even though in its infancy, the courts are already deluged with petitions to "retry" some murder cases. There are hundreds, if not thousands, of these types of cases.

The theoretical hearing may extend for days, perhaps even longer, and there appears to be no limitation on what a petitioner can introduce as "new" evidence to obtain relief. (Pen. Code, § 1170.95, subd. (d)(3).) A literal and expansive reading of the statute does not foreclose a petitioner from introducing alibi, mental defenses, duress, and any other evidence to impeach either express or implied factual findings in the earlier trial. In my view, this has not been properly thought out. The Legislature's decision to provide for retroactivity is akin to what Justice Macklin Fleming referred to as: "The moving finger rewrites the past." (Fleming, The Price of Perfect Justice (1974) pp. 13-21.) Our criminal courts are already over-burdened and to now add new remedies to impeach presumptively correct final judgments seems counter-productive. And with the passage of time, here 22 years, the People will have evidentiary problems in carrying it's beyond a reasonable doubt burden of proof.

There must, of necessity, come a time when litigation should cease. This should, at the very least, be recognized and considered by the Legislature before it "tinkers" with long final

1

judgments.  Perhaps the perceived problem could have been remedied administratively by relaxing parole rules or simply changing the punishment for some murders.  As Justice Fleming has said, "An important consequence of the development of retroactivity has been the blurring of the authority of a final judgment.  The sharp focus of a judgment as a final determination in an action of the right of the parties has faded into an ambiguous depiction rendered in the style of subjective impressionism."  (Fleming, The Price of Perfect Justice, *supra*, at pp. 19-22.)  Perhaps a subsequent Legislature will want to further cut back on murder rules.  Are we again ordered to conduct a further round of evidentiary hearings in the pursuit of "perfect justice?"

The concept of the "finality of judgment" should be a goal of the criminal justice system.  A judgment in a criminal action should not have the "'semblance'" of finality.  (*In re Clark* (1993) 5 Cal.4th 750, 765-766.)  "'[W]ithout finality, the criminal law is deprived of much of its deterrent effect.'"  (*In re Harris* (1993) 5 Cal.4th 813, 831.)  As Justice Harlan has said in his concurring in part, dissenting in part in *Mackey v. United States* (1971) 401 U.S. 667, 691, "No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation . . . ."  (See *In re Harris, supra*, at p. 831.)  The California Legislature did not need this admonition.

Even though this is remedial legislation which should be liberally construed, there must, of necessity be some limit to the statute or else the Legislature would not have enumerated the exceptions to the new statute.  And, as indicated, petitioner can

2

seek to introduce "new" evidence.  This too, of necessity, should be subject to reasonable limits.  (See Evid. Code, § 352.)  And, as indicated in the majority opinion, there is a gate keeping function at play here.  The gate should not be opened except upon a prima facie showing.

Now, what are the "new" facts petitioner would attempt to prove?  Petitioner would tender an innocent explanation for the historical evidence.  Let us assume that he admits to being present at the scene of the crime.  He would minimize his involvement with the gang, and say that he was unaware of the "green light."  He did not go on a hunt to execute the "green light."  He would deny that he punched or kicked the victim.  He would also deny that he directed the stabbing.  He would deny having taunted the victim.  He would deny having congratulated the actual cohort who did the stabbing.  He would say that he did not intend that the victim to be killed.  He was "merely present."

Perhaps petitioner could come up with another or further explanation.  Any such explanation will be 1. At variance with the historical record; and 2. Be far-fetched.  It would not comport with common sense or how a street gang operates.  Appellant is not entitled to a retrial of his case.

### Final Thoughts

I have been watching the flurry of cases where superior court judges, all over the state, have ruled that the new statute is unconstitutional.  With the exception of Justices O'Rourke, Poochigian, and Ramirez, the remaining justices all opine to the contrary.

The statute has a serious flaw on a theory not previously raised.  The People of the State of California have a constitutional right to trial by jury in criminal cases.  (Cal. Const.

art. I, § 16; see, e.g., *People v. Washington* (1969) 71 Cal.2d 1061, 1086-1087.)  This, of course, includes the right to have a jury decide a case by verdict.  The Legislature may not pass a statute which has the effect of abolishing, curtailing, or interfering an express constitutional right.  In the guise of an "ameliorative" retroactive resentencing statute, it may have retroactively interfered with the People's constitutional right at the initial trial by voiding the jury verdict.  It again may have interfered with the constitutional right to jury trial by allowing a "retrial" to the superior court, sitting without a jury.

The Legislature may reduce punishment for crime.  It may even allow the reduction to apply retroactively.  But can it tamper with a constitutional right afforded to the People?  I do not reach any conclusion on this issue on this appeal.  A record on this issue and briefing on this issue, is not here presented.  But make no mistake, this issue lurks beneath the calm surface of a roiling constitutional sea.

<u>CERTIFIED FOR PUBLICATION.</u>


YEGAN, J.

4

Jacquelyn H. Duffy, Judge

Superior Court County of San Luis Obispo

_____

Vanessa Place, under appointment by the Court of Appeal for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.